❏ Original          ❏ Duplicate


CLERK'S OFFICE
A TRUE COPY
Sep 22, 2025
s/MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| Records and information associated with the cellular | ) |
| device assigned call number (414) 323-9074 ("Target | ) |
| Cell Phone"), further described in Attachment A | ) |

Case No.    25    MJ    165

Matter No. 2023R109

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before        10/06/2025        *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to        Honorable William E. Duffin        .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*    ☑ until, the facts justifying, the later specific date of        07/22/2026        .

Date and time issued:        09/22/2025 at 10:00 a.m.        

_William E. Duffin_
*Judge's signature*

City and state:        Milwaukee, Wisconsin        

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**
**Matter Number 2023R109**

1.      Records and information associated with the cellular device assigned telephone

number **(414)-323-9074** (referred to herein and in Attachment B as **"Target Cell Phone",**) with

an unknown subscriber, used by Duane WILLIAMS, that is in the custody or control of Verizon

Wireless (referred to herein and in Attachment B as the "Service Provider" or "Provider"), a

wireless communications service provider that is headquartered at 1095 Avenue of the Americas,

New York, NY 10036.

2.      The **Target Cell Phone**.

**ATTACHMENT B**
**Particular Things to be Seized**
**Matter Number 2023R109**

I.     **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a.  The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone** for the time period from October 18, 2024, to present:

        i.  Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

        viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records; and

43

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **Target Cell Phone** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone** or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone**.

c. Information about the location of the **Target Cell Phone** for a period of **30 days**, during all times of day and night. "Information about the location of the **Target Cell Phone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall

44

compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1), and 843(b) involving Duane WILLIAMS (DOB:XX/XX/1998), and other known and unknown individuals since May 2024.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.

45


CLERK'S OFFICE
A TRUE COPY
Sep 22, 2025
s/MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

## for the

### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Records and information associated with the cellular<br>device assigned call number (414) 323-9074 ("Target<br>Cell Phone"), further described in Attachment A | ) ) ) ) ) ) |

Case No. 25 MJ 165

Matter No. 2023R109

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. §§ 841(a)(1),<br>843(b), and 846 | Distribution of a Controlled Substance, Possession with the Intent to Distribute a<br>Controlled Substance, Use of a Communication Facility in Furtherance of a Drug<br>Trafficking Offense, and Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 07/22/2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Mitchell Ward, USPIS TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 09/22/2025

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT
## Matter No. 2023R109

I, Mitchell WARD, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(414)-323-9074** ("**Target Cell Phone**"), whose service provider is Verizon ("Service Provider"), a wireless telephone service provider headquartered at 1095 Avenue of the Americas, New York, NY 10036.  The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3.      Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application(s) by the United States of America for an order(s) pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing,

routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phone**.

4.      I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation, (DCI) and have been a sworn officer in the State of Wisconsin for over 33, years.  I am currently assigned to DCI's Milwaukee Field Office, Narcotics Bureau.  I am also a federally deputized task force officer for the United States Postal Inspection Service ("USPIS").  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

5.      As a federal task force officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency and other evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have also spoken on numerous occasions with other experienced narcotics investigators, both foreign and domestic, concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses which specialized

2

in the investigation of narcotics trafficking and money laundering. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

6.      I have participated in complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses.  More specifically, my training and experience includes the following:

   a.      I have utilized informants to investigate drug trafficking.  Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

   b.      I have experience conducting street surveillance of individuals engaged in drug trafficking.  I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

   c.      I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine.  I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale.  I know the street values of different quantities of the various controlled substances;

   d.      I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations.  I am familiar with the language utilized over the telephone or other communication applications to discuss drug trafficking, and know that the language is often limited, guarded, and coded. Additionally, I know that drug traffickers often change their phone numbers and cellular devices on frequent basis in an attempt to thwart law enforcement from tracking their phones and to conceal their identity.

3

e.     I know that drug traffickers commonly have in their possession, and at their residences and other locations ("stash houses") where they exercise dominion and control, controlled substances, firearms, ammunition, drug proceeds, and records or receipts pertaining their drug trafficking;

f.     I know that drug traffickers used what is refer to as a "stash house" to stow illegal items such as illegal controlled substance, packaging paraphernalia, illegal firearms, ledgers, and US currency. Often times members of drug trafficking organizations have to make stops at the stash locations to pick up illegal controlled substance to deliver. Additionally, drug traffickers will have customers meet drug traffickers near the stash location. Multiple stops can be made in a day at these locations. This is done so the trafficker does not have to carry additional illegal controlled substances in their vehicle or person or maintain them at their residence. This protects the trafficker from law enforcement investigations as they do not have illegal controlled substances on them after the delivery is made or inside their personal residence. Often time the US currency will be transported after the delivery to the stash house to protect against law enforcement investigation and rival drug trafficker's robbery crews.

g.     I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

h.     I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

7.     I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my

4

investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

8.     The facts in this affidavit come my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; (c) court-authorized electronic communications; and (d) information obtained from cooperating citizen witnesses, confidential sources, and defendants, whose reliability is established herein. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

10.    Based on the facts set forth in this affidavit, there is probable cause to believe that the crimes of distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances, and use of a communications facility to facilitate a drug-trafficking offense, violations of Title 21 United States Code Sections 841(a)(1), 846, and 843(b), have been committed by Duane WILLIAMS and other known and unknown individuals.  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

**JURISDICTION**

5

11.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

12.     Since February 2023, the Drug Enforcement Administration (DEA), the United States Postal Inspection Service (USPIS), and the Wisconsin Department of Justice have been conducting an investigation involving Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH (XX/XX/1990), James E JAMES III and other known and unknown individuals, who are believed to be members of a Milwaukee-area based DTO engaged in the distribution of cocaine/fentanyl and believed to be sourced from California.

### A.     Background

13.     On February 23, 2023, United States Postal Inspection Service Inspector Kim Lincoln was alerted to a parcel bearing USPS Priority Mail Express tracking number EI 649 372 511 US (wooden crate) being shipped to Jordan Woodman at the address 1940 North 15th Street, Milwaukee, WI, 53205.  The parcel was shipped from California with a return name and address of the "Earthquake Store" located in Burbank California.  The address of 1940 North 15th Street does not exist, and the parcel was not delivered.  Later, on February 23, 2023, two individuals showed up at the Hilltop Post Office in Milwaukee, Wisconsin attempting to take custody of the package addressed to Jordan Woodman.  The first individual claimed to be James Woodman and further stated to the employee at the post office that he was the nephew of Jordan Woodman.  The second individual stated they were Jordan Woodman.  However, the post office would not

6

relinquish custody of the package because the address on the ID provided by Jordan Woodman was 1942 North 15th Street which did not match the address the parcel was addressed to. Inspector Lincoln ultimately discovered that the parcel contained just over two kilograms of fentanyl.

14. Case agents then examined USPS databases and discovered that this parcel and others were being tracked by IP addresses in both California and Mexico. Case agents identified other packages identical to the initial parcel (EI 649 372 511) containing fentanyl all addressed to Jordan Woodman, two in Milwaukee, one in the Saint Louis, Missouri area, and one in northern Illinois. On February 27, 2023, case agents were conducting follow-up regarding the parcel (EI 649 372 511) at the Hilltop Post Office when an individual came to the counter attempting to claim the package. This person identified himself to Postal Inspectors as Jordan Woodman. This subject presented an ID Card Receipt from the Wisconsin Department of Transportation issued to Jordan Woodman at 1942 N 15th Street, Milwaukee, WI, 53205. Once the subject realized that they were speaking with law enforcement officers and not Post-Office employees, he and a second subject with him immediately left the post office. Case agents later determined that the identification Woodman presented was false and positively identified him as Patrick VAUGHN. Case agents also identified the subject claiming to be "James" (nephew of Jordan Woodman) as James E. JAMES III. Both JAMES and VAUGHN are Milwaukee residents.

15. On June 14, 2023, SA Mitchell Ward along with USPIS Inspector Kim Lincoln interviewed Patrick VAUGHN regarding this investigation. VAUGHN admitted to attempting to retrieve the parcel (EI 649 372 511 US) from the Hilltop Post Office for his drug supplier nicknamed "400" on February 23, 2023. VAUGHN said he buys small amounts of cocaine and "weed" (i.e., marijuana) from "400". VAUGHN stated he did not know "400's" real name, but provided his phone number, i.e., 414-627-2727, which VAUGHN used to contact "400" to arrange

7

the purchase of cocaine. VAUGHN stated that "400" uses various cars to deliver cocaine. VAUGHN described "400" as a black male, aged between mid-thirties and early-forties, who had a short or bald hairstyle.

16.     Case agents then obtained a court order authorizing them to obtain call information related to telephone 414-627-2727 and reviewed historical call detail records of telephone 414-627-2727. Case agents recognized VAUGHN's number as one of the top callers to telephone 414-627-2727. From April 14, 2023, to June 14, 2023, VAUGHN was using telephone number 414-998-7482 and communicated 127 times with telephone 414-627-2727. Case agents know that VAUGHN's phone number is 414-998-7482 because VAUGHN provided case agents consent to review the contents of his phone when he was interviewed on June 14, 2023.

17.     Additionally, case agents identified another top caller as Bradley DIDENKO of 3142 South Pine Street (lower), Milwaukee, Wisconsin. DIDENKO was using telephone number 414-881-9687 for the time period of April 19, 2023, to June 16, 2023, and call records reflect 365 calls between DIDENKO and telephone 414-627-2727. A search of law enforcement databases showed that Jordan MAYRAND also resided at 3142 South Pine Street (lower), Milwaukee, Wisconsin 53207. On June 9, 2023, the West Allis Police Department arrested MAYRAND for several felony drug offenses (Eastern District of Wisconsin case no.: 23-cr-219) and he has remained in custody since that time.

18.     On August 1, 2023, a State of Wisconsin search warrant was executed at DIDENKO's residence, 3142 S. Pine Ave, Milwaukee, WI. Due to the nature of the search warrant and contact with Law Enforcement, DIDENKO's probation and parole officer put a probation hold on DIDENKO and DIDENKO was taken into custody.

8

19.     On August 1, 2023, case agents interviewed Bradley DIDENKO.  DIDENKO stated that he regularly purchases small amounts of fentanyl from an unknown black male. DIDENKO stated that he calls telephone 414-627-2727 to arrange the purchase of fentanyl. DIDENKO stated the same person does not always deliver the fentanyl to him after he places an order.  DIDENKO stated that the "main guy" is a black male who he knows only by the nickname of "Fast."  DIDENKO stated that although he recently hasn't seen "Fast," "Fast's workers" last sold him a gram of fentanyl on July 31, 2023.  DIDENKO said he typically buys between a half gram and a gram of fentanyl every other day.  Case agents know that DIDENKO was using telephone number 414-881-9687 to contact telephone 414-627-2727 because he provided consent for case agents to review the contents of his cellular phone when he was interviewed on August 1, 2023.

20.     On August 16, 2023, case agents spoke with a confidential source (CS-1) regarding this investigation. CS-1 stated that an individual known as "Fast" sells fentanyl and cocaine in the greater Milwaukee area.  CS-1 stated that "Fast" has been using telephone 414-627-2727 to conduct sales of fentanyl and cocaine for the past year.  CS-1 stated that once the order is placed on telephone 414-627-2727, either "Fast" or one of his "crew" delivers the narcotics at various locations in the greater Milwaukee area.  CS-1 stated that most narcotics transactions with "Fast" occur in public areas chosen by "Fast."

21.     I believe that CS-1's information is credible and reliable because CS-1 has given information concerning individuals involved in illegal activities.  CS-1's information has been independently verified through this investigation, including through controlled drug buys, queries of law enforcement databases, and surveillance.  CS-1 has made statements against his/her penal interest.  CS-1 has felony convictions for Manufacture/Delivery Cocaine and Forgery.  CS-1 has

9

no arrests or convictions relating to dishonesty.  CS-1 is cooperating with law enforcement for monetary compensation. Case agents are aware that CS-1 cooperated with another law enforcement agents in April 2023 and during a controlled buy, CS-1 attempted to keep some of the controlled substances.  Law enforcement confronted CS-1 and CS-1 admitted to that conduct. In relation to the controlled buys outlined below, case agents have conducted surveillance and reviewed the recorded drug buys.  Case agent have not observed any incidents of dishonesty or concerns about CS-1 keeping any of the controlled substances during this investigation.

22.     On September 20, 2023, the Honorable Stephen C. Dries, United States Magistrate Judge in the Eastern District of Wisconsin, authorized a warrant for electronic surveillance of telephone number 414-627-2727.

**B.     Controlled Buys**

23.     Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as the CS-1, purchases drugs from a target at the direction of law enforcement.  For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents.   The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction.  A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures.  Further, often the calls to the target

10

by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

24.     Under the direction of case agents CS-1 made a total of six controlled buys by communicating with the holder of telephone 414-627-2727.

a.     **October 5, 2023, Controlled Buy - Anton MATTHEWS**

25.     On October 5, 2023, CS-1 arranged to purchase 1 gram of crack cocaine and 1/2 gram of fentanyl for $130 USC by calling 414-627-2727. Telephone 414-627-2727 was answered by an unknown male who directed CS-1 to come to 4936 North 40th Street, Milwaukee, Wisconsin to complete the transaction. CS-1 explained to case agents that 4936 North 40th Street was a location often used by this DTO and stated they had been directed to this address on several occasions. CS-1 stated that this was a residential address with a long wheelchair ramp coming from the front door and extending towards the street. Approximately five minutes after CS-1 confirmed the location, CS-1 received another call from telephone 414-627-2727 and CS-1 was then instructed to meet in the area of 7th Street and Capitol in Milwaukee. CS-1 stated they'd been to this area in the past to conduct transactions and believed there was a house in this area where they would be directed. CS-1 did not recall an exact address.

26.     Surveillance had already been established in the area of 7th Street and observed a silver Jeep Cherokee, bearing Wisconsin plates ALY-1398 (Jeep) arriving in front of 4076 North 7th Street. According to the Wisconsin Department of Transportation, ALY-1398 is registered to Anton MATTHEWS at 4076 North 7th Street, and case agents positively identified MATTHEWS as the driver of the Jeep based on MATTHEWS driver's license photograph. MATTHEWS was observed exiting the Jeep and walking to the front porch area of 4076 North 7th Street. A short time later, MATTHEWS was observed walking back toward the Jeep and entering the driver's

11

seat. MATTHEWS was then observed pulling away from the front 4076 North 7th Street and immediately pulling over around the corner on Fiebrantz Avenue, just East of 7th Street.

27.     CS-1 received another phone call from telephone 414-627-2727 shortly after the Jeep pulled around the corner. CS-1 was instructed to meet near the alley that runs behind the 7th Street address. CS-1 was then observed by case agents arriving in the area and pulling directly behind the Jeep on Fiebrantz Avenue. CS-1 was observed by case agents exiting the CS vehicle and entering the front passenger seat of the Jeep. CS-1 was inside the Jeep for approximately two minutes. While inside the Jeep, CS-1 obtained suspected controlled substances in exchange for $130. CS-1 then exited the Jeep and returned to Cs-1's vehicle. CS-1 was followed directly back to the predetermined meet location by case agents where CS-1 turned over two small baggies, one containing suspected crack cocaine and one containing suspected fentanyl. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results. CS-1 was later shown a driver's license photograph of Anton MATTHEWS, who CS-1 positively identified as the individual who sold CS-1 the suspected crack cocaine and suspected fentanyl inside the Jeep. CS-1 stated that MATTHEWS was not the individual CS-1 knew as "Fast."

28.     Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-1 of CS-1's interaction with MATTHEWS and said recordings corroborate the information provided by CS-1 about what occurred during this transaction.

### b.     October 12, 2023, Controlled Buy - Lorenzo GOODEN

29.     On October 12, 2023, under the direction of case agents, CS-1 conducted a controlled purchase of fentanyl and crack cocaine with the DTO. CS-1 called telephone number 414-627-2727, and it was answered by an unknown male. CS-1 was instructed to come to the area

12

of 1st Street and National in Milwaukee, Wisconsin.  CS-1 was followed by case agents to the area of 1st Street and National where surveillance had already been established.  CS-1 parked on the south side of East Florida Street to the east of 1st Street, Milwaukee, Wisconsin.  Approximately two minutes later, case agents observed a black Nissan SUV, bearing Wisconsin plates AKF-5062 (Nissan) arrive in the area and park on the opposite side of Florida Street from CS-1's vehicle.

30.    CS-1 exited his/her vehicle and entering the front passenger seat of the Nissan.  The Nissan then pulled away east on Florida Street and pulled over in the area of Florida Street and Water Street.  The Nissan stopped for a very brief period of time at Florida Street and Water Street and then drove back to where CS-1's vehicle was parked.  CS-1 exited the Nissan and got back into CS-1's vehicle.  While inside the Nissan, CS-1 obtained suspected controlled substances in exchange for $130.  The Nissan was under constant visual surveillance by case agents for the duration of the interaction with CS-1.  CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.  Once back at the predetermined location CS-1 handed over two small baggies, one containing suspected crack cocaine and the other containing suspected fentanyl.  The suspected crack cocaine and suspected fentanyl weighed approximately 1 gram each and were later subjected to field tests where they both yielded positive results.

31.    CS-1 was later shown a photograph of GOODEN, who CS-1 positively identified as the individual in the black Nissan who had sold CS-1 the suspected crack cocaine and suspected fentanyl.  CS-1 stated that GOODEN was not the individual CS-1 knew as "Fast."  Case agents also compared the video recording from the buy and booking photographs of GOODEN and positively identified GOODEN as the individual that sold CS-1 fentanyl and crack cocaine. Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-1

13

of CS-1's interaction with GOODEN and said recordings corroborate the information provided by CS-1 about what occurred during this transaction.

### c. October 26, 2023, Controlled Buy - Duane WILLIAMS

32. On October 26, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of 1/2 gram of fentanyl and 1 gram of crack cocaine for $130 USC. CS-1 called telephone 414-627-2727, which was again answered by an unknown male. CS-1 was instructed to come to the area of 7th Street and Walnut in Milwaukee, Wisconsin. CS-1 was then directly followed by case agents to the area of North 7th and Walnut where surveillance had already been established. CS-1 ultimately parked the CS-1's vehicle on West Reservoir Avenue just to the west of North 7th Street. Approximately twenty minutes after CS-1 parked on West Reservoir Avenue, case agents observed a silver Honda Accord car bearing Wisconsin plates ANY-6044 (Accord) arrive in the area and park near the CS vehicle. CS-1 was then observed exiting the CS-1's vehicle and walking to the Accord. CS-1 was observed leaning into the passenger window of the Accord for approximately three minutes. While leaning into the Accord, CS-1 obtained suspected controlled substances in exchange for $130. CS-1 then walked back to CS-1's vehicle and departing the area. CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time. Once back at the predetermined location CS-1 handed over approximately one gram of suspected fentanyl and one gram of suspected crack cocaine to case agents. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results.

33. Utilizing a law enforcement database, case agents were able obtain and compare booking photographs and determined that Duane WILLIAMS (DOB: XX/XX1998) was the driver of the Accord. CS-1 was later shown a photograph of WILLIAMS to which CS-1 positively

14

identified as the individual who had sold CS-1 the suspected crack cocaine and suspected fentanyl. CS-1 further stated that CS-1 believes that WILLIAMS lives at 4936 North 40th Street, Milwaukee, Wisconsin, due to previous interactions with WILLIAMS at this address. CS-1 stated that during the deal with WILLIAMS, CS-1 observed a Glock with an extended magazine tucked in between the driver's seat and the center console of WILLIAMS vehicle in plain view. Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-1 of CS-1's interaction with WILLIAMS and said recordings corroborate the information provided by CS-1 about the drug transaction.

34.     Case agents also reviewed WILLIAMS' criminal history. On July 16, 2019, WILLIAMS was convicted of the felony offense of Vehicle Operator Attempting to Flee/Elude Officer in Milwaukee County Case Number 2019CF1598.

35.     During surveillance at 4936 North 40th Street, Milwaukee, Wisconsin, I also observed the Accord parked in the driveway at on multiple occasions. Additionally, case agents observed DIDENKO meet with the Accord on July 31, 2023, in the alley behind DIDENKO's residence, 3142 South Pine Street (lower), Milwaukee, Wisconsin. On this occasion, case agents observed what appeared to be a hand-to-hand drug transaction between DIDENKO and the driver of the Accord.

### d.     November 13, 2023, Controlled Buy - Duane WILLIAMS

36.     On November 13, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of fentanyl and crack cocaine in exchange of $130 USC. Case agents met CS-1 at a predetermined location and CS-1 called telephone number 414-627-2727, and the call went unanswered. A few moments later CS-1 received an incoming call from telephone number 414-627-2727 and the individual calling instructed CS-1 to go to the area of North 41st Street and West

15

Hampton Avenue. CS-1 believed the person utilizing telephone number 414-627-2727 was the same individual (Duane WILLIAMS) that CS-1 had met with on October 26, 2023, based on the sound of the voice.

37. CS-1 was followed by case agents to the 4500 block of North Sherman Boulevard. At this point, CS-1 received an incoming call from telephone number 414-627-2727 and was directed to go to the area of North 14th Street and West Capitol Drive. Prior to CS-1 arriving, case agents established surveillance in the 3900 block of North 14th Street in anticipation of the deal. Once arriving in the area, case agents observed Duane WILLIAMS occupying the driver's seat of the Accord which was parked in front of 3943 North 14th Street. Case agents also observed an unknown female passenger in the Accord.

38. Once CS-1 arrived in the area, CS-1 was observed parking on the west side of the street, directly in front of the Accord. CS-1 was then observed exiting CS-1's vehicle and walking to the passenger side of the Accord where CS-1 engaged with the occupants of the Accord through the open passenger window. CS-1 completed the controlled purchase and was observed walking back to CS-1's vehicle and departing the area. CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.

39. Once back at the predetermined location CS-1 handed over approximately one gram of suspected fentanyl and one gram of suspected crack cocaine to case agents. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results.

40. CS-1 stated that CS-1 had observed two Ziplock bags in WILLIAMS' lap, one containing what appeared to CS-1 as "at least five ounces of purple fentanyl" and the other contained what appeared to contain "three ounces of cocaine." CS-1 stated that WILLIAMS

16

retrieved small amounts of both substances and weighed them on a small digital scale located on the arm rest of the Accord. CS-1's statements were corroborated by the Audio and Video recording device that CS-1 was equipped with during this transaction.

### e. November 30, 2023, Controlled Buy - Duane WILLIAMS

41. On November 30, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of fentanyl and crack cocaine in exchange of $130 USC. Case agents met CS-1 at a predetermined location and CS-1 called telephone 414-627-2727, and the call went unanswered. A few moments later, CS-1 received an incoming call from the telephone 414-627-2727. CS-1 answered the call and was ultimately instructed to come to the area of North 40th Street and West Hampton Avenue. Case agents were already aware that Duane WILLIAMS lived at 4936 North 40th Street and surveillance units were sent to that location after the phone call between CS-1 and telephone 414-627-2727. Once surveillance units were established, a black Maserati sedan (Maserati) was observed back into the driveway of 4936 North 40th Street and case agents observed a black male occupying the driver's seat. CS-1 was followed by case agents from predetermined location to the area of the 4900 block of North 40th Street and park CS-1's vehicle on the East side of the road. CS-1 was observed walking to the Maserati and engaging with the driver of the vehicle through the open driver's window. CS-1 conducted the drug transaction and was then observed walking back to the CS vehicle and departing the area. CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.

42. Following the controlled purchase, case agents again met with CS-1 at a predetermined location. Once at the predetermined location CS-1 handed over approximately one-half gram of suspected fentanyl and one-half gram of suspected crack cocaine to case agents. The

17

suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results. CS-1 stated CS-1 had observed two plastic Ziploc bags in WILLIAMS' lap, one containing what appeared to CS-1 to be "a large amount of purple fentanyl" and the other contained what appeared to contain "an ounce of cocaine." CS-1 stated that WILLIAMS had retrieved small amounts from each bag and weighted them on a small digital scale located on the arm rest of the Maserati and then handed CS-1 loose amounts of each product, without a container. CS-1 also observed a large stack of US Currency located near the gear shifter of the Maserati that CS-1 estimate to be six inches thick. Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-1 of CS-1's interaction with WILLIAMS and said recordings corroborate the information provided by CS-1 about the drug transaction.

### f.    January 23, 2024, Controlled Buy – Rico SMITH

43.    On January 23, 2024, under the direction of case agents, CS-1 conducted another controlled purchase of crack cocaine in exchange $130 USC. Case agents met CS-1 at a predetermined location and CS-1 called telephone 414-627-2727, and CS-1 was directed by a male voice to come to the area of 3rd Street and West Scott in Milwaukee, Wisconsin. CS-1 was followed from the predetermined location to the area of 3rd and Scott where surveillance had already been established. CS-1 was observed parking near the intersection of South 3rd Street and West Scott. Just a few moments later case agents observed a black Acura SUV, Wisconsin plate AMZ-2064 (Acura) arrive and park on the opposite side of the street as CS-1's vehicle. CS-1 was observed exiting CS-1's vehicle and walking to the Acura and engaging with the driver of the Acura through the open driver's window. CS-1 and the driver conducted the drug transaction at this point. CS-1 ultimately walked back to CS-1's vehicle and departed the area. Surveillance was terminated shortly after this transaction and the Acura was not followed away from the area.

18

44.     Following the controlled purchase, case agents again met with CS-1 at a predetermined location.  Once at the predetermined location CS-1 handed over a small plastic baggie containing suspected crack cocaine.  The suspected crack cocaine was later subjected to field tests where it yielded positive results.  The suspected cocaine was approximately 2.2 grams.

45.     CS-1 later stated to case agents that the individual driving the black Acura was the individual CS-1 knew as "Fast."  Case agents later positively identified "Fast" as Rico L. SMITH by comparting surveillance photographs to SMITH's Wisconsin Driver's license photograph.  CS-1 was also shown a Wisconsin Driver's License photograph of SMITH with no name or identifies visible, and CS-1 positively identified the photograph as the individual CS-1 knew to be "Fast."  Additionally, the Acura, driven by SMITH, is registered to Kimberly NEAL, with an address of 623 West Clarke Street, Milwaukee, Wisconsin.  Based on my training and experience, I know that it's common for drug traffickers to use vehicles not registered to themselves to avoid identification.  Through previous law enforcement contacts and reports reviewed, case agents believe that NEAL is SMITH's girlfriend.   Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-1 of CS-1's interaction with SMITH and said recordings corroborate the information provided by CS-1 about the drug transaction.

### g.     May 9, 2024, Controlled Buy - Duane WILLIAMS

46.     In May 2024, case agents developed a confidential source (CS-2) who stated they could purchase fentanyl from a subject CS-2 knew as "BJ."  CS-2 provided telephone number (262) 412-5521 as the number that CS-2 uses to contact "BJ."  Case agents were already aware through law enforcement database checks that the owner or holder of telephone number (262) 412-5521 was Duane WILLIAMS, who resides at 4936 North 40th Street, Milwaukee, Wisconsin.  Case agents provided a photograph of WILLIAMS to CS-2, who identified the person in the

19

photograph as "BJ." CS-2 stated that "BJ" lived near 40th and Hampton in Milwaukee and further said that "BJ" lived in a house that had a long wheelchair ramp. Case agents are aware that WILLIAMS's residence is approximately two blocks north of Hampton Avenue, directly on North 40th Street, and has a long wheelchair ramp that extends from the front door down to the sidewalk. CS-2 stated that "BJ" typically charges $80 per gram of fentanyl.

47.     I believe that CS-2's information is credible and reliable because CS-2 has given information concerning individuals involved in illegal activities. CS-2's information has been independently verified through this investigation, including through controlled drug buys, queries of law enforcement databases, and surveillance. CS-2 has made statements against his/her penal interests. CS-2 has one felony conviction for flee/elude traffic officer. CS-2 has no arrests or convictions relating to dishonesty. CS-2 is cooperating with law enforcement for judicial consideration related to a felony criminal investigation.

48.     On May 9, 2024, under the direction of case agents, CS-2 arranged to purchase $600 worth of fentanyl from WILLIAMS by communicating with WILLIAMS who was using telephone number (262) 412-5521. During the call, WILLIAMS told CS-2 that he was on 40th Street. Case agents and CS-2 already knew that WILLIAMS resided at 4936 North 40th Street, Milwaukee, Wisconsin. At this time, case agents dispatched surveillance units to the area of 4936 North 40th Street. Case agents then followed CS-2 from the predetermined meeting location to the vicinity of 4936 North 40th Street, Milwaukee, Wisconsin. Once CS-2 arrived in that area, CS-2 placed another call to telephone number (262) 412-5521 and was instructed by WILLIAMS to go inside the residence and retrieve the fentanyl from a green boot. WILLIAMS further instructed CS-2 to leave the money inside the boot. Case agents observed CS-2 exit CS-2's vehicle and enter the front door of 4936 North 40th Street, Milwaukee, Wisconsin where CS-2 was out of

20

the case agents' view for a few moments. Case agents later learned from CS-2 that once inside, CS-2 retrieved fentanyl from a boot and left $600, before exiting the front door. Case agents observed CS-2 return to CS-2's vehicle and depart the area. Case agents directly followed CS-2 from WILLIAMS's residence to a predetermined meeting location.

49.     Once at the meeting location, case agents recovered from CS-2 a plastic sandwich bag that contained a greyish/purple substance suspected to be fentanyl. The suspected fentanyl had a weight of 6.4 grams and was later subjected to a field test where it yielded positive results for the presence of fentanyl. Case agents later reviewed the audio/video captured by CS-2 during the controlled buy and found it to corroborate CS-2's version of events.

### g.     June 3, 2024, Controlled Buy - Duane WILLIAMS

50.     On June 3, 2024, under the direction of case agents, CS-2 arranged to purchase $400 worth of fentanyl from WILLIAMS by communicating with WILLIAMS who was using the telephone number (262) 412-5521. During the call, WILLIAMS directed CS-2 to come to the area of 86th and Silver Spring in Milwaukee, Wisconsin.

51.     Case agents followed CS-2 from the predetermined location to the area of North 91st Street and Silver Spring. At that time, case agents monitoring CS-2's active audio/video devices overheard CS-2 receive a call from WILLIAMS, who directed CS-2 to come to the alley between North 90th and North 91st Street to the north of West Thurston Avenue. Case agents maintained visual contact with CS-2 as CS-2 turned north on North 91st Street, east on West Thurston Avenue, and then made an immediate left turn into the alley between North 90th and North 91st Street. As CS-2 pulled into the alley, case agents observed a gray SUV parked in the middle of the alley. Case agents observed a heavyset black male standing next to the passenger side of the SUV engaging with the driver through the open passenger window. Case agents

21

observed CS-2 pulling up to the SUV's driver's side window and engage with the driver of the gray SUV through both vehicles' open driver's side windows. As CS-2 pulled up to the window of the SUV, the unknown black male that was standing next to the passenger side was observed walking away from the SUV and entering the apartment building 5670 North 91st Street, Milwaukee, Wisconsin, using the lower-level northeast corner door of the building (Figure 1).



(Figure 1)

52.     Your affiant observed CS-2 hand a white plastic bag to the SUV's driver and then, moments later, observed the SUV's driver throw a white plastic bag into CS-2's vehicle through its open driver's side window. Case agents then observed CS-2 depart the area of the buy and drive to a nearby parking lot as directed by case agents. Case agents directly followed CS-2 from the area of the buy to the meeting location. At no time was CS-2 out of the case agents' sight.

53.     Once at the meeting location, CS-2 provided case agents with a white plastic grocery bag that contained a white rock-like substance suspected to be fentanyl. CS-2 stated that some of the suspected fentanyl had fallen out of the bag when thrown into CS-2's vehicle during the controlled buy. Case agents thoroughly searched CS-2 and CS-2's vehicle and recovered

22

several small pieces of suspected fentanyl from the passenger seat and floorboard area of CS-2's vehicle. CS-2 positively identified the driver of the gray SUV as "BJ" (WILLIAMS). CS-2 said "BJ" provided CS-2 the suspected fentanyl in exchange for $400. The suspected fentanyl was left in the plastic grocery bag and had a total gross weight of 13.1 grams. The suspected fentanyl was later subjected to a field test where it yielded positive results for the presence of fentanyl. Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-2 of CS-2's interaction with WILLIAMS and said recordings corroborate the information provided by CS-2 about the drug transaction.

54.     As the gray SUV exited the area of the controlled purchase, case agents were able to identify the vehicle as a Maserati SUV bearing Wisconsin plate AVP-9573 (SUV). According to the Wisconsin Department of Transportation, this plate lists to a 2018 gray Maserati Levante and is registered to Dantavia Vernard Rule with an address of 161 West Wisconsin Avenue, #225, Milwaukee, Wisconsin. The SUV was not surveilled as it departed the area due to its erratic driving behavior.

55.     In preparation for this controlled purchase, case agents had also dispatched surveillance units to the area of WILLIAMS's residence, located at 4936 North 40th Street, Milwaukee, Wisconsin. Approximately 10 minutes after WILLIAMS left the alley where the controlled purchase took place, surveillance units observed the SUV arrive and park in the driveway of WILLIAMS's residence. Surveillance units were able to determine the plate on the vehicle to be AVP-9573 and also observed a black male exit the SUV and enter 4936 North 40th Street. Minutes after the black male entered the residence, the same black male exited the front door at which time DEA Special Agent Julia Gray obtained photographs of this black male. I later

23

viewed these photographs and positively identified the black male depicted in the photographs as Duane WILLIAMS.

### h. August 15, 2024, Controlled Buy - Duane WILLIAMS

56. On August 15, 2024, under the direction of case agents, CS-2 arranged to purchase $240 worth of fentanyl from WILLIAMS. CS-2 provided telephone number 414-308-2767 as a number CS-2 had recently received from WILLIAMS as WILLIAMS new telephone number. CS-2 made telephone contact with WILLIAMS by calling 414-308-2767. During the call, WILLIAMS directed CS-2 to come to the area of 91st and Silver Spring in Milwaukee, Wisconsin.

57. Case agents followed CS-2 from the predetermined location to the area of North 91st and Silver Springs in Milwaukee, Wisconsin. CS-2 was observed turning north on North 91st from Silver Spring and then east on West Thurston Avenue. CS-2 then made an immediate north bound turn into the alley between North 91st and North 90th Street where the CS was observed parking in the alley. Just moments before CS-2 was observed entering the alley, case agents observed a silver Honda Accord, Wisconsin Plate AXX-8065 (silver Honda) pull into the alley and park on the parking slab approximately three structures north of Thurston on the west side of the alley. Wisconsin plate AXX-8065 is registered to Jaia DOUGLAS with a registered address of 4605 North 48th Street, Milwaukee, Wisconsin. DOUGLAS is the known girlfriend of Duane WILLIAMS.

58. As CS-2 was observed parking, case agents observed a subject that was later positively identified as WILLIAMS exit the silver Honda and engage with CS-2 through CS-2's open driver's side window. Case agents monitoring the audio/video device CS-2 was equipped with overheard WILLIAMS tell CS-2, "let me go get it together." WILLIAMS was then observed walking from CS-2's vehicle to 5670 North 91st Street, Milwaukee, Wisconsin and entering the

24

location using the lower-level northeast corner door of the building (previously depicted in Figure 1).  After several minutes, case agents observed CS-2 exit CS-2's vehicle and walk to the same lower-level northeast corner door of 5670 North 91st Street, Milwaukee, Wisconsin (previously depicted in Figure 1) where CS-2 could be observed interacting with someone in the threshold of the lower-level northeast corner door.  CS-2 remained in the doorway for just a brief moment and was then observed walking back to CS-2's vehicle and departing the area.  Case agents then directly followed CS-2 away from the location back to a predetermined location.  At no time was CS-2 out of view of case agents.

59.     Once at the predetermined location, CS-2 handed over a small baggie containing suspected fentanyl that was purple in color.  CS-2 positively identified WILLIAMS as the subject that had provided the baggie of suspected fentanyl to CS-2 while CS-2 was in the lower-level northeast corner doorway of 5670 North 91st Street, Milwaukee, Wisconsin.  CS-2 stated that when CS-2 initially arrived in the alley, CS-2 saw WILLIAMS walking from the silver Honda to CS-2's vehicle.  CS-2 stated that they believed WILLIAMS had the fentanyl at this time and had handed WILLIAMS the buy money. CS-2 stated that after WILLIAMS took the buy money, WILLIAMS said that he had to go get it (referring to the fentanyl).  CS-2 stated that CS-2 saw WILLIAMS walk into the third apartment building to the north of West Thurston Avenue, and further stated that WILLIAMS entered the door on the ground floor farther to the right when looking at the rear of the structure, identified by case agents as lower-level northeast corner door of 5670 North 91st Street, Milwaukee, Wisconsin (depicted in Figure 1).  CS-2 stated that after several minutes, CS-2 observed WILLIAMS in the lower-level northeast corner doorway of 5670 North 91st Street, Milwaukee, Wisconsin waving for CS-2 to come to the doorway.  CS-2 stated that at this time CS-2 left CS-2's vehicle and went to the lower-level northeast corner doorway of 5670 North 91st

25

Street, Milwaukee, Wisconsin where WILLIAMS was currently weighing out the fentanyl on a scale inside the apartment unit. CS-2 stated that CS-2 observed three other unidentified black males inside the northeast corner unit of the lower-level apartment unit of 5670 North 91st Street, Milwaukee, Wisconsin. CS-2 also observed additional fentanyl in plain view inside this apartment unit of 5670 North 91st Street, Milwaukee, Wisconsin. CS-2 further stated that it appeared the apartment unit located in lower-level northeast corner of 5670 North 91st Street, Milwaukee, Wisconsin was a stash house of some kind used by WILLIAMS based on the number of unknown individuals inside and the fact that drugs and scales were in plain view from the doorway. Case agents do not believe WILLIAMS resides at the 5670 North 91st Street, Milwaukee, Wisconsin. On the morning of August 16, 2024, case agents observed the silver Honda parked in the driveway of 4936 North 40th Street, Milwaukee, Wisconsin, consistent with WILLIAMS still residing at that location.

60.     The suspected fentanyl the CS-2 provided to case agents totaled 4.1 grams. The suspected fentanyl was later subjected to a field test where it yielded positive results for the presence of fentanyl. Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-2 of CS-2's interaction with WILLIAMS and said recordings corroborate the information provided by CS-2 about the drug transaction.

### C.     Arrest of Deangelo ALBOYD-BROWN

61.     On April 15, 2024, Deangelo ALBOYD-BROWN (DOB: XX/XX/1992) was arrested during the execution of a federal search warrant at 2533 W. Monroe Street, Milwaukee, Wisconsin. Case agents located a suspicious parcel in the mail stream that was addressed to Shirley Alexander, 2533 W. Monroe Street, Milwaukee, WI. The sender of the package was John Alexander, 17167 N. 9th #1107, Phoenix, Arizona. A search of law enforcement databases

26

indicated the sender name and address and recipient name shown on the shipping label were fictious.  On April 12, 2024, case agents obtained a federal search warrant signed by U.S. Magistrate Judge William Duffin to search the suspicious parcel and found it to contain approximately 530 grams (with packaging) of blue M30 Oxycodone pills.  The pills were confirmed to be counterfeit and contained fentanyl per laboratory analysis.  ALBOYD- BROWN was searched upon his arrest and was found to have a purple and yellow sock in his lower left cargo pocket.  The sock contained two clear plastic bags filled with a white powdery/chunky substance and one clear plastic bag that contained a purple powdery substance.  The bags of white powdery/chunky substance had a combined weight of 30.9 grams and field tested positive for the presence of cocaine.  The purple powdery substance had a weight of 1.63 grams and field tested positive for the presence of fentanyl.  Case agents also recovered a large sum of money inside ALBOYD- BROWN's left cargo pocket, a weighmax digital scale in his right cargo pocket, a silver and black iPhone with a large sum of money in his right front pants pocket.  In total the currency recovered from ALBOYD- BROWN's person totaled $4,010.00.  ALBOYD- BROWN also had two black iPhones in his right hand when he was taken into custody.

62.     On April 16, 2024, the Honorable Barry Phillips, Court Commissioner of the First Judicial District, signed a State of Wisconsin search warrant allowing the search/examination of the three cellular phones located on ALBOYD- BROWN during his arrest.  Case agents reviewed portions of the data extractions for two of the three iPhones recovered from ALBOYD- BROWN.  One of the iPhones recovered had an assigned telephone number of 414-627-2727, which is the same telephone number used to make controlled purchases from Anton MATHEWS, Duane WILLIAMS, Lorenzo GOODEN, and Rico SMITH.  The other iPhone had an assigned telephone number of 414-315-2807.  Both phone extractions contained numerous text messages exchanges

that based on my training and experience were related to the distribution of narcotics.  It was also evident based on my training and experience that the phones recovered from ALBOYD- BROWN were the phones being used to sell the narcotics and not purchase them.

63.     A text message was located inside the download for telephone number 414-627-2727 that stated, "U never no phones I'm get my shit back u slowing the phones down."  This message was sent by telephone number 414-316-0463 on November 18, 2023.  Case agents conducted controlled buys by calling telephone number 414-627-2727 on November 13, 2023, and November 30, 2023, and Duane WILLIAMS appeared to be in possession of telephone 414-627-2727 during both controlled purchases.  Through my training and experience, I believe the text message sent on November 18, 2024, is from a leader of the DTO, informing the drug runners that this individual would like the phones back due to the runner not selling enough product.

**D.     Arrest of Duane WILLIAMS**

64.     On September 4, 2024, Duane WILLIAMS was taken into custody by members of the Milwaukee County Sheriff's Department after WILLIAMS was traffic stopped on I-94 near Rawson Road in Milwaukee, Wisconsin.  WILLIAMS was subsequently interviewed by case agents related to his involvement with the distribution of cocaine and fentanyl in the city of Milwaukee.  WILLIAMS also provided written consent to case agents during this interview for case agents to search two iPhones that were recovered from WILLIAMS during the traffic stop.

65.     Case agents reviewed data contained in the cellular phones WILLIAMS provided consent to search.  WILLIAMS was using telephone numbers 262-412-5521 and 414-308-2767. WILLIAMS had a contact saved under the name of "Rico" in WILLIAMS' telephone with the assigned number of 262-412-5521.  "Rico" had an assigned telephone number 414-316-0463.  In a text message conversation between WILLIAMS and telephone number 414-316-0463 on April

28

16, 2024, which was one day after ALBOYD- BROWN's arrest, WILLIAMS asked, "What's the other number" to which telephone number 414-316-0463 responded with "3152807" and "6272727" which were the telephone numbers of two cellular phones referenced above that were recovered from ALBOYD- BROWN. The telephone number 414-316-0463 also said, "Bro u slow the whole time I'm telling u to change the phone over to a flip u thought I want some cheap as phone to have bitch." Through my training and experience, I believe the last message from telephone number 414-316-0463 was directing WILLIAMS to change or "port" the phone numbers of the phones recovered from ALBOYD- BROWN to new phones indicating that the holder of telephone number 414-316-0463 is a leader within this organization.

66.    During WILLIAMS' *Mirandized* interview, WILLIAMS stated to case agents that WILLIAMS knew a subject that went by the name of "Man-Man," who case agents know to be Lorenzo GOODEN.   WILLIAMS was provided with a photograph of GOODEN to which WILLIAMS positively identified as the subject WILLIAMS knew to be "Man-Man."  WILLIAMS stated that GOODEN would provide WILLIAMS with cellular phones and approximately one ounce of purple fentanyl at a time and WILLIAMS would sell the fentanyl for GOODEN. WILLIAMS stated that the "627 number" was GOODEN's and later clarified that he was referring to telephone number 414-627-2727.  WILLIAMS stated that it was always GOODEN that would deliver the phones to WILLIAMS and WILLIAMS estimated that he would be in possession of the phones a few times per month.  WILLIAMS could not recall the telephone number to the second phone and was only able to remember the 627-2727 telephone number.

67.    WILLIAMS was asked during the interview if he knew anyone else that would be in the area of WILLIAMS' mother's house located on N. 57th Street in the city of Milwaukee. WILLIAMS stated, "if you're talking about my cousin, he don't be there anymore."  WILLIAMS

29

further stated that his cousin was "Rico." WILLIAMS was then asked if his cousin knew any of the people that had been discussed during the interview in reference to the telephones being passed around to sell fentanyl and WILLIAMS pointed at the photograph of GOODEN which was still laying on the interview table and said, "these his guys" to which case agents understood WILLIAMS to mean "Rico" was a leader within the organization. It should be noted that during the controlled buy on January 23, 2024, when telephone number 414-627-2727 was called, Rico SMITH showed up to the meeting location and sold crack cocaine to CS-1.

68. WILLIAMS was processed at the DEA's Milwaukee Field Office on September 24, 2024, and released pending further investigation in this case.

69. On October 18, 2024, Duane WILLIAMS was arrested by the Milwaukee Police Department regarding a carjacking that occurred in the city of Milwaukee. WILLIAMS was charged in Wisconsin Circuit Court, Milwaukee County Case 2024CF005229 with two counts of Carjacking: Possession of a Weapon as a Party to a Crime. Corneilous J JENKINS (XX-XX-XX04) and Anthony C KIRKWOOD (XX-XX-XX02) were also charged along with WILLIAMS.

70. On April 14, 2025, WILLIAMS' cash bond of $25,000 was posted to the Milwaukee County Sheriff's Office by Shakiva GRAY. WILLIAMS provided the court with the home address of 5667 North 57th Street. Case agents are aware that this address is where WILLIAMS' grandmother resides. As of June 10, 2025, WILLIAMS updated his phone number with the court and provided the 414-758-8788 to the court.

71. On April 26, 2025, case agents spoke to CS-3 regarding this investigation. CS-3 is familiar with WILLIAMS and has positively identified a photo of WILLIAMS in prior interviews. CS-3 is aware the WILLIAMS is the cousin of Rico SMITH, and that WILLIAMS has the alias of

"Black." CS-3 was told by SMITH that SMITH did contribute to WILLIAMS' bail fund but is unaware of the amount SMITH contributed.

72.     I believe that CS-3 is credible and reliable because CS-3 has provided intelligence concerning drug trafficking activities for known persons identified in this investigation that have been independently corroborated through queries of law enforcement databases, law enforcement investigations and information gathered during this case. CS-3 has also made statements against his/her own penal interests. CS-3 has 5 felony convictions. CS-3 has no arrests or convictions relating to dishonesty. CS-3 is cooperating with law enforcement in exchange for consideration regarding felony drug trafficking offenses. CS-3's information has led to the seizure of over ½ kilogram of fentanyl, over $200,000 U.S. Currency, multiple firearms, and two arrests.

73.     On August 23, 2025, city of Milwaukee Police Officers executed a State of Wisconsin search warrant at the last known address of Duane WILLIAMS, 4936/38 North 40th Street in the city and county of Milwaukee, WI. Milwaukee Police Detective Jake Puschnig informed case agents that the property was now vacant and that Duane WILLIAMS and his girlfriend, Jaia DOUGLAS, moved out at the beginning of the month.

**E. Review of WI Department of Correction recorded phone calls**

74.     Case agents conducted a review of recorded calls from the Wisconsin Department of Corrections. Case agents found a recorded prison call made from Arkel ALEXANDER to the telephone number 414-758-8788 on August 25, 2025. Based on the investigation and review of law enforcement database records, case agents are aware that Arkel ALEXANDER is WILLIAMS' brother. Case agents reviewing the call recognized WILLIAMS' voice, based on prior interactions with WILLIAMS. During the call, WILLIAMS tells ALEXANDER that he does not know why they were looking for looking for me at the "old spot." Case agents believe this

31

statement is in reference to the search warrant executed at WILLIAMS' prior known address, 4936/38 North 40th, Milwaukee, Wisconsin, on August 23, 2025. ALEXANDER tells WILLIAMS that "you need to change your numbers." Based on my training and experience, I believe that this meant that ALEXANDER was advising WILLIAMS to drop WILLIAMS' existing telephone number(s) and to acquire a new telephone number to frustrate law enforcement's ability to investigate WILLIAMS' drug trafficking and ability to locate WILLIAMS.

75. On September 9, 2025, case agents identified a recorded prison call made by Arkel ALEXANDER to 414-217-8749. Law enforcement data bases identify this number belonging to Deborah WATFORD, the mother of both Duane WILLIAMS and Arkel ALEXANDER. During the call, ALEXANDER asks his mother "hey call my brother." WATRFORD asked, "who." ALEXANDER states, "Black," and case agents are aware that WILLIAMS has the nickname of "Black." A few minutes later, WILLIAMS can be heard on a three-way call. Case agents recognized WILLIAMS' voice from prior interactions and monitored calls and recordings. WILLIAMS tells ALEXANDER that he is with "Ronnie" who case agents know to be Karon BROWN.

76. Case agents obtained historical call record for 414-217-8749 belonging to Deborah WATFORD. Case agents were able locate a record of an incoming call to WATFORD from the Wisconsin Department of Corrections on September 9, 2025. The call records show that during the duration of the call from DOC, an outgoing call was made to 414-323-9074 (**Target Cell Phone**). The call went unanswered, however an incoming call from 414-323-9074 (**Target Cell Phone**) was made in succession and connected. From this, I believe that during the inmate call with ALEXANDER, WATFORD called WILLIAMS at **414-323-9074** (**Target Cell Phone**).

32

**F. Controlled Buy from Karon BROWN and Duane WILLIAMS**

77.    On September 11, 2025, at the direction of case agents in conjunction with members of the Northcentral HIDTA Interdiction Task Force, CS-4 conducted a controlled buy from Karon BROWN.  CS-4 arranged to purchase $100 worth of cocaine from BROWN. Case agents met with CS-4 at a predetermined meet location in preparation for the controlled buy. Case agents searched CS-4 and found no contraband. In the presence of case agents, CS-4 attempted to make a consensually recorded phone call to BROWN at the number of 414-750-9690. The call when unanswered. CS-4 stated that this was typical and told case agents that CS-4 would often arrive at BROWN's residence unannounced. CS-4 was then driven to the area near BROWN's residence by an undercover officer (UC) in an undercover police vehicle. CS-4 was provided with a digital recording device at this point.  Prior to arriving in the area, case agents established surveillance on the target location.

78.    I believe that CS-4's information is credible and reliable because CS-4 has given information concerning individuals involved in illegal activities.  CS-4's information has been independently verified through this investigation, including through controlled drug buys, queries of law enforcement databases, and surveillance.  CS-4 has made statements against his/her penal interest.  CS-4 has one felony conviction for Misappropriate Identification to Obtain Money and one open Misdemeanor charge of Possession of Drug Paraphernalia. CS-4 is cooperating with law enforcement for monetary compensation.

79.    At approximately 12:55pm, on September 11, 2025, case agents observed the UC officer and CS-4 enter the alley behind BROWN's residence. The UC officer parked directly behind BROWN's residence. CS-4 then made a call to 414-750-9690 and had a short conversation. A few moments later, case agents observed the rear door of BROWN's residence open and an arm

33

extending past the doorway waving CS-4 inside. CS-4 then got out of the UC vehicle and walked directly into BROWN's residence. Case agents could see that the rear door of BROWN's residence remained open while CS-4 was inside.

80.     At approximately, 1:00pm, CS-4 emerged from the rear door of BROWN's residence and got into the UC vehicle.  The UC officer then drove directly to a predetermined location where case agents recovered the suspected cocaine purchased by CS-4 and the digital recording device. The suspected cocaine was later subjected to a field-test where the substance tested positive for the presence of cocaine.  CS-4 stated that BROWN was in the shower when CS-4 entered BROWN's residence. CS-4 was waved into the residence by a black male CS-4 believed to be BROWN's cousin. This subject sold CS-4 the suspected cocaine in the kitchen of BROWN's residence.  CS-4 also stated that CS-4 spoke to BROWN about purchasing a "switch." BROWN told CS-4 that it would cost $1,500 for a pistol equipped with a switch (MCD).

81.     Case agents later reviewed a recording of the controlled buy completed by CS-4. The recording confirms the CS' account of what took place during the transaction.  The UC officer remained in the UC auto that was parked directly behind BROWN's residence giving the UC a direct view of the back door. The UC officer observed a black male open the door and wave at CS-4 and the UC.  The UC officer positively identified this subject as Duane WILLIAMS. The UC officer stated that WILLIAMS was wearing a white A-shirt and green jogging pants.  The UC officer observed that the back door of BROWN's residence remained open during the time CS-4 was inside until CS-4 returned to the UC auto.

### G. Review of WI Department of Correction recorded phone calls

34

82. On September 15, 2025, case agents reviewed a recorded call made from Demetrius WILLIAMS' account (WI DOC) to Deborah WATFORD, 414-217-8749. I recognized the inmate caller's voice as Arkel ALEXANDER. ALEXANDER begins the call by asking WATFORD, "Where's Black." ALEXANDER talks with a child for a few moments then says, "call Black." A short time later, case agents are able to recognize Duane WILLIAMS' voice on the call. ALEXANDER asks WILLIAMS "why you ducking my calls? WILLIAMS then states, "Arkel, I just woke up." ALEXANDER tells WILLIAMS, "I don't even have your number," and WILLIAMS states, "hell naw you ain't got my number, too much going on with the Po.."

83. Case agents reviewed historical call records for 414-217-8749, the number used by Deborah WATFORD. Case agents located a record showing an incoming call from WI DOC to WATFORD on September 15, 2025. During the duration of call, there is a record of an outgoing call to **414-323-9074** (**Target Cell Phone**). From this, I believe that during the inmate call with ALEXANDER, WATFORD called WILLIAMS at **414-323-9074** (**Target Cell Phone**).

84. Case agents obtained historical call records for 414-779-0971 belonging to Jaia DOUGLAS. Case agents were able to determine that the telephone number 414-758-8788 (Duane WILLIAMS' prior phone number) is in communication with DOUGLAS's telephone 414-779-0971. Telephone 414-758-8788 was in communication with DOUGLAS's telephone 414-779-0971 with the last contact on August 22, 2025. Case agents determined that beginning on September 14, 2025, DOUGLAS's number (414-779-0971) was in communication with **414-323-9074 (Target Cell Phone)**.

85. Case agents reviewed historical call records for 414-217-8749 belonging to Deborah WATFORD. Case agents determined that WILLIAMS' prior number of 414-758-8788 was in contact with WATFORD's phone until September 3, 2025. All the completed calls between

35

WATFORD and WILLIAMS's phones were voice calls and not SMS or text messages. Case agents determined that **414-323-9074 (Target Cell Phone)** was in contact with WATFORD's phone starting on September 15, 2025 and were all voice calls as well.

86.    Case agents reviewed a reliable law enforcement database, which indicated that telephone number **414-323-9074 (Target Cell Phone)'s** service provider is Verizon Wireless. On September 16, 2025, case agents submitted a subpoena to Verizon Wireless regarding the **Target Cell Phone** and as of the submission of this affidavit the results have not been returned. I believe that WILLIAMS is currently utilizing the **Target Cell Phone** to further WILLIAMS' drug trafficking and other criminal activities.

## TECHNICAL BACKGROUND

87.    Case agents believe the **Target Cell Phone,** whose service provider is Verizon Wireless ("Service Provider"), a wireless telephone service provider, continues to contain valuable information on this account that could be used as evidence for the possible crimes of possession of distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances, and use of a communications facility to facilitate a drug-trafficking offense, violations of Title 21 United States Code Sections 841(a)(1), 846, and 843(b).

88.    Based on my training and experience, I know that Service Provider can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on Service Provider's network or with such other reference points as may be reasonably available.

### A.    Cell-Site Data

36

89.     In my training and experience, I have learned that Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

90.     Based on my training and experience, I know that Service Provider can collect cell-site data on a historical and prospective basis about the **Target Cell Phone.** Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business to use this information for various business-related purposes.

**B.     E-911 Phase II / GPS Location Data**

37

91.     I know that some providers of cellular telephone service, including Service Provider, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

92.     As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

93.     I also know that certain wireless providers, such as Service Provider, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

94.     Based on my training and experience, I know that Service Provider also can collect per-call measurement data, which Service Provider also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based

38

upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

95. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available.

## C. Pen-Trap Data

96. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## D. Subscriber Information

97. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number)

39

provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.

## AUTHORIZATION REQUEST

98.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

99.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

100.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the locations of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.   The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

101.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until July 22, 2026, consistent with the omnibus order signed buy Magistrate Judge Stephen C. Dries on July 22, 2025, after the collection authorized by the warrant has been completed. There is

reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

102. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phone** outside of daytime hours.

41

**ATTACHMENT A**
**Property to Be Searched**
**Matter Number 2023R109**

1.      Records and information associated with the cellular device assigned telephone number **(414)-323-9074** (referred to herein and in Attachment B as **"Target Cell Phone"**,) with an unknown subscriber, used by Duane WILLIAMS, that is in the custody or control of Verizon Wireless (referred to herein and in Attachment B as the "Service Provider" or "Provider"), a wireless communications service provider that is headquartered at 1095 Avenue of the Americas, New York, NY 10036.

2.      The **Target Cell Phone**.

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.   The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone** for the time period from October 18, 2024, to present:

    i.   Names (including subscriber names, user names, and screen names);

    ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.   Local and long distance telephone connection records;

    iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.   Length of service (including start date) and types of service utilized;

    vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

    viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records; and

43

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **Target Cell Phone** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone** or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone**.

c. Information about the location of the **Target Cell Phone** for a period of **30 days**, during all times of day and night. "Information about the location of the **Target Cell Phone**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phone** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall

44

compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    **Information to be Seized by the Government**

All information described above in Section I that constitutes evidence and instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1), and 843(b) involving Duane WILLIAMS (DOB:XX/XX/1998), and other known and unknown individuals since May 2024.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.

45